Opinion issued August 31, 2012



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-09-01096-CV

————————————

**RICHARD HAYNES, Appellant**

**V.**

**UNION PACIFIC RAILROAD COMPANY, Appellee**

**AND**

**UNION PACIFIC RAILROAD COMPANY, Appellant**

**V.**

**RICHARD HAYNES, Appellee**

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2006-40557**

## OPINION

Appellant Richard Haynes sued his employer, appellee Union Pacific Railroad Company, for injuries he sustained when a railcar struck his personal vehicle as he was leaving the railroad yard. After a jury trial, Haynes was awarded damages of $456,300 plus interest. Both parties appealed. Among other issues, Haynes contends that the trial court erred by overruling his *Batson* challenge to peremptory strikes exercised by Union Pacific during jury selection. We conclude that the *Batson* challenge should have been sustained. Accordingly, we reverse and remand for a new trial. Our disposition makes it unnecessary for us to address Haynes's other issues or Union Pacific's cross-appeal.

## Background

Richard Haynes worked as a car inspector at Union Pacific's Strang Yard. He was seriously injured when a rail car collided with his vehicle as he was leaving at the end of his shift. Haynes suffered physical and psychological injuries, and he sued Union Pacific for damages under the Federal Employers Liability Act (FELA). *See* 45 U.S.C. §§ 51–60. His claims were tried to a jury.

After voir dire, the parties exercised their peremptory strikes. *See* TEX. R. CIV. P. 232, 233. Of the 24 potential jurors in the strike zone, six identified their race on juror information cards as "black" or "African American." Union Pacific exercised all six of its strikes, four of which were used to eliminate black venire

2

members from the jury. Haynes raised a *Batson* challenge, thereby alleging that Union Pacific had relied on race as a factor informing the use of its peremptory strikes, in violation of the Equal Protection Clause of the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712 (1986).

The trial court assumed that the use of four of six peremptory strikes to block four of six potential black jurors constituted a prima facie case of racial discrimination. Union Pacific's counsel was then given the opportunity to articulate race-neutral justifications for the strikes, and Haynes's counsel responded with argument. In overruling the *Batson* challenge, the trial court commented, "I think that the railroad has stated an adequate basis, neutral basis for the challenges that it exercised."

## Analysis

### I. *Batson* procedure

Over twenty-five years ago, the United States Supreme Court declared in *Batson* that the racially motivated use of peremptory challenges in criminal cases violates the Fourteenth Amendment's guarantee of "equal protection of the laws." *Id.* at 85, 97–98, 106 S. Ct. at 1716, 1723–24. Five years later, this holding was extended to civil trials in *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 618–28, 111 S. Ct. 2077, 2081–87 (1991). The resolution of a *Batson* challenge involves a three-step process: (1) the party challenging the strike must establish a

3

prima facie case of racial discrimination; whereupon (2) the burden shifts to the striking party to present a race-neutral explanation; and (3) if the striking party does so, the party challenging the strike must prove purposeful racial discrimination. *Miller–El v. Dretke (Miller-El II)*, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324–25 (2005); *Goode v. Shoukfeh*, 943 S.W.2d 441, 445–46 (Tex. 1997).

At the initial stage, the objecting party may rely on "all relevant circumstances" to raise an inference of purposeful discrimination. *Miller-El II*, 545 U.S. at 240, 125 S. Ct. at 2325 (citing *Batson*, 476 U.S. at 96–97, 106 S. Ct. 1712). Once a prima facie case has been established, the party who exercised a challenged strike must present a comprehensible, racially neutral reason for the strike, but the reason need not be "persuasive, or even plausible," so long as it is not discriminatory. *Purkett v. Elem*, 514 U.S. 765, 767–768, 115 S. Ct. 1769, 1770–71 (1995) (per curiam). Nevertheless, the explanation for the strike must be clear and reasonably specific. *See Miller-El II*, 545 U.S. at 239, 125 S. Ct. at 2324. "A neutral explanation means that the challenge was based on something other than the juror's race." *Goode*, 943 S.W.2d at 445 (citing *Hernandez v. New York*, 500 U.S. 352, 360, 111 S. Ct. 1859, 1866–67 (1991)). "[O]nce a party offers a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of a prima facie case is moot." *Goode*, 943 S.W.2d at 445.

4

At the conclusion of the *Batson* procedure, "the trial court must determine if the party challenging the strike has proven purposeful racial discrimination, and the trial court may believe or not believe the explanation offered by the party who exercised the peremptory challenge." *Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 515 n.4 (Tex. 2008); *see also Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771. The persuasiveness of the justification for the peremptory strike is critical. *E.g.*, *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771; *Baker v. Sensitive Care—Lexington Place Health Care, Inc.*, 981 S.W.2d 753, 756 (Tex. App.—Houston [1st Dist.] 1998, no pet.). "At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768, 115 S. Ct. at 1771. However, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* Throughout the *Batson* process, including any appeal, the party exercising the strike must rely on the explanation originally proffered in response to the prima facie case. As explained by the Supreme Court:

> A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

*Miller-El II*, 545 U.S. at 252, 125 S. Ct. at 2332.

We review a trial court's ruling on a *Batson* challenge for abuse of discretion. *Davis*, 268 S.W.3d at 515. A trial court abuses its discretion if its

5

decision is arbitrary, unreasonable, and without reference to guiding principles. *See, e.g.*, *Goode*, 943 S.W.2d at 446. Our review considers "all relevant circumstances" to determine whether race was a factor in the exercise of a peremptory challenge. *Davis*, 268 S.W.3d at 511, 516. If it was, then the jury selection process violated the Equal Protection Clause. *See id*. at 524 (citing *Powers v. Palacios*, 813 S.W.2d 489, 491 (Tex. 1991)). The improper exclusion of even one juror offends the Constitution, requiring reversal and remand for a new trial. *See Snyder v. Louisiana*, 552 U.S. 472, 478, 128 S. Ct. 1203, 1208 (2008).

## II. Statistical disparity

Union Pacific used four of its six peremptory strikes to eliminate four of six potential black venire members (67%) from the jury. In *Davis v. Fisk Electric Co.*, 268 S.W.3d 508 (Tex. 2008), the Supreme Court of Texas observed that "happenstance" was unlikely to produce the disparity of a party striking 83% of potential African American jurors (five of six) compared to 5.5% of the eligible nonblack prospective jurors. *See Davis*, 268 S.W.3d at 516 (citing *Miller-El v. Cokrell (Miller-El I)*, 537 U.S. 322, 342, 123 S. Ct. 1029, 1042 (2003)). Although the disparity in this case was not as wide as that in *Davis* or in *Miller-El* (in which 91% of eligible black venire members were excluded, *see Miller-El II*, 545 U.S. at 240, 125 S. Ct. at 2325), we nevertheless note, as part of our review of the "totality of the circumstances," that the statistical disparity of Union Pacific striking 67% of

6

the potential black jurors while striking only 11% of the eligible nonblack venire members was similarly unlikely to be produced by happenstance. *See Davis*, 268 S.W.3d at 516.

III.     **Comparative juror analysis**

More compelling than the raw statistics in this case is a close analysis of Union Pacific's justifications given for what was characterized by counsel as its "hardest strike." Juror No. 3 was a 60-year-old man who identified his race as "black" on his juror information card. The information card also indicated that he completed two years of college and had worked for one year and five months as a "part inspector" for a manufacturing company. He was married, had adult children, and lived in an apartment. Juror No. 3 was not specifically questioned by either side during voir dire, and the record does not reflect that he responded to any questions addressed to the venire panel generally. During the hearing on Haynes's *Batson* challenge, Union Pacific's counsel gave the following explanation for striking Juror No. 3:

> He did have a two-year college. He is the only one with any education that I struck. And I had so much to pick from. He lived in an apartment. He had only been at his job a short time, one year and five months, even though he was 60 years old. And I—the read I got out of him, he seemed awfully warm toward [Haynes's counsel] Mr. Cohen and seemed to adopt a lot of the things Cohen was saying. And there was that sense, as well as the fact he lives in an apartment, which is sometimes one thing I look at, because I don't want to say has and has nots, but relative to the other jurors, he didn't have as much education and had a[n] address and a short time at his job.

In summary, we discern from this explanation four racially neutral reasons articulated by Union Pacific for striking Juror No. 3: (1) lack of education; (2) living in an apartment; (3) duration of his employment; and (4) non-verbal conduct.

In some circumstances, a proffered explanation for a peremptory strike could be merely pretext for purposeful discrimination. A reason for striking a black venire member may be considered to be pretextual if it applies equally well to an otherwise-similar venire member who is not black and is permitted to serve on the jury. *Miller-El II*, 545 U.S. at 241, 125 S. Ct. at 2325. In making such a comparison, struck venire members need not be compared only "to jurors who are identical in all respects (save race): 'A per se rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.'" *Davis*, 268 S.W.3d at 512 (quoting *Miller-El II*, 545 U.S. at 247 n.6, 125 S. Ct. 2329). In addition, striking a potential juror based on a group bias, when there is no evidence that the group bias applies to that particular person, can also suggest pretext. *Id.* at 522 (citing *Whitsey v. State*, 796 S.W.2d 707, 716 (Tex. Crim. App. 1989)).

## A. Lack of education

Union Pacific's counsel made repeated references during the *Batson* hearing to the potential jurors' level of education, and he stated that "[e]ducation was very

important to me in this case." Counsel noted "with respect to the panel as a whole" that he considered it "a very good panel and very highly educated." He stated repeatedly that "nine jurors" had four-year college degrees or postgraduate degrees, although a review of the juror information cards reveals that in fact only eight of the jurors had that level of education. Three people selected for the jury, Jurors Nos. 28, 32, and 38, all indicated that their "highest level of education completed" was a high-school diploma. On their juror information cards, each of these jurors indicated their race as "white" or "Caucasian." Another member of the panel, Juror No. 10, was the only black member selected for the jury, and like Juror No. 3, he indicated "2 yr college" as his highest level of education completed.

Although Union Pacific's counsel asserted that education was a primary factor guiding his exercise of peremptory strikes, he asked no questions during voir dire that directly pertained to education. The failure to ask questions about the reason given for a strike suggests pretext. *See, e.g.*, *Miller-El II*, 545 U.S. at 246, 125 S. Ct. 2328. Moreover, to the extent that "[e]ducation was very important" to Union Pacific's counsel in the selection of the jury, rather than providing a racially neutral explanation for the strike used against Juror No. 3, that consideration instead raises unanswered questions about why Juror No. 3 was struck rather than

9

any of the three white members of the venire panel who became jurors despite having less education than Juror No. 3.

## B. Living in an apartment

Union Pacific's counsel stated that he "sometimes" considers the fact that a potential juror lives in an apartment, and he noted that Juror No. 3 "lived in an apartment." The lawyer asked no questions about apartment dwelling during voir dire, and the only further explanation he provided during the *Batson* hearing for this factor in his decision to strike Juror No. 3 was his comment, "I don't want to say has and has nots."

The juror information card does reflect that the home address for Juror No. 3 was an apartment. However, the juror information cards for Jurors Nos. 5 and 11, both self-identified "Caucasians" who were selected for the jury, reflected that each of them also lived in apartments. The lawyer provided no further explanation in the *Batson* hearing to distinguish Juror No. 3 from the white apartment dwellers who were not struck from the jury.

Union Pacific argues on appeal that Juror No. 3 was not otherwise similar to the white jurors who lived in apartments because Jurors Nos. 5 and 11 had stable, professional careers. But nothing in the record establishes that Juror No. 3's career was not stable. Without asking him a single question, Union Pacific's attorney apparently classified Juror No. 3 as a "has not" because he lived in an apartment

and worked as a parts inspector. Even to the extent this could have been an accurate, though unconfirmed, assumption about the socio-economic status of Juror No. 3, no questions were asked of him to confirm that he shared whatever undesirable perspective counsel associated with living in an apartment or otherwise being a "has not." *See Davis*, 268 S.W.3d at 522 (pretext suggested by group bias when the group trait is not shown to apply specifically to the challenged juror). Nor were any questions asked of Jurors Nos. 5 and 11 to confirm that they did not share the undesirable perspectives that counsel associated with living in an apartment.

## C. Duration of employment

A third racially neutral explanation provided to justify the strike of Juror No. 3 was counsel's observation that "[h]e had only been at his job a short time, one year and five months, even though he was 60 years old." However, like his education level and status as an apartment dweller, Juror No. 3's length of employment also did not distinguish him from the nonblack members of the venire panel who were not struck and thus were selected for the jury. Juror No. 7, a self-identified "white" man who was selected for the jury, was 59 years old and had been working for his employer "1 year." Counsel provided no further explanation of why he considered the length of Juror No. 3's employment to be significant, apart from also noting his age, such that Juror No. 3 could be distinguished from

Juror No. 7 in this regard. *See Miller-El II*, 545 U.S. at 241, 125 S. Ct. at 2325 (pretext suggested by rationale that equally applies to otherwise-similar nonblack juror).

## D. Nonverbal conduct

Finally, Union Pacific's counsel also relied on the nonverbal conduct of Juror No. 3 to justify the decision to strike him from the jury. In his original explanation, counsel stated that Juror No. 3 "seemed awfully warm" toward opposing counsel and "seemed to adopt a lot of the things [he] was saying." Haynes's counsel examined Union Pacific's lawyer to further develop this rationale for the strike:

> HAYNES'S ATTORNEY: [I]n exactly what way did juror No. 3 demonstrate to you a coziness or friendliness toward me, as you related to the judge?
>
> UNION PACIFIC'S ATTORNEY: That was the slender gentleman wearing a suit, as I recall it. He, with his face, with his what I interpret as body language, openly paid attention to you. I didn't think he was quite as attentive to me. I didn't have a bad feel, but I didn't have a good feeling. And he was my hardest strike, I will tell you that. I ruminated over it a while. His lack of education and living in an apartment is important.
>
> HAYNES'S ATTORNEY: I merely asked you what he demonstrated to you that you took as cozying up or being–
>
> UNION PACIFIC'S ATTORNEY: A smile that was not an open smile, but a pleasant smile and more of a closed expression looking at me.

Because reliance upon nonverbal conduct or demeanor may mask a racially motivated strike, we must carefully examine this explanation. *See Davis*, 268 S.W.3d at 518. Merely stating that a venire member "reacted" is not sufficient to overcome a *Batson* challenge. *Id.* "Peremptory strikes may legitimately be based on nonverbal conduct, but permitting strikes based on an assertion that nefarious conduct 'happened,' without identifying its nature and without any additional record support, would strip *Batson* of meaning." *Id.* "Verification of the occurrence may come from the bench if the court observed it; it may be proved by the juror's acknowledgement; or, it may be otherwise borne out by the record as, for example, by the detailed explanations of counsel." *Id.* Although the trial judge's observations of non-verbal conduct are of great importance, no rule of law mandates rejection of a demeanor-based explanation if the judge did not observe or cannot recall the juror's demeanor. *Thaler v. Haynes*, 130 S. Ct. 1171, 1174–75 (2010).

In *Snyder v. Louisiana*, 552 U.S. 472, 128 S. Ct. 1203 (2008), the Supreme Court held that a prosecutor improperly struck a venire person. *Snyder*, 552 U.S. at 474, 128 S. Ct. at 1206. The prosecutor had offered two racially neutral reasons for striking the potential juror. *Id.* One reason was the potential juror's apparent concern over missing school. *Id.* at 478, 128 S. Ct. at 1208. But this reason was not supported by the record, which showed that a member of the trial court's staff

13

contacted the dean of the school and verified that it would be no problem for the potential juror to miss a few days of class. *Id.* at 481, 128 S. Ct. at 1210. The other reason the prosecutor offered was the potential juror's nonverbal conduct and demeanor. *Id.* at 478; 128 S. Ct. at 1208. The prosecutor stated simply, "[H]e looked very nervous to me throughout the questioning." *Id.* In rejecting that reason, the Supreme Court stated:

> [D]eference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike. Here, however, the record does not show that the trial judge actually made a determination concerning Mr. Brooks' demeanor. The trial judge was given two explanations for the strike. Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. Mr. Brooks was not challenged until the day after he was questioned, and by that time dozens of other jurors had been questioned. Thus, the trial judge may not have recalled Mr. Brooks' demeanor. Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.

*Id.* at 479, 128 S. Ct. at 1209.

In *Davis*, Fisk Electric Company struck a potential juror, based in part on nonverbal conduct and demeanor. *Davis*, 268 S.W.3d. at 516. Counsel stated that this potential juror nonverbally "reacted that corporations should be punished with

14

the use of punitive damages." *Id.* Although Fisk stated that this juror was "the most clear" on this, the nonverbal conduct was not otherwise borne out by the record, and the juror was not questioned about it. *Id.* at 518. The Supreme Court of Texas noted that "Fisk's failure to question [the venireman] about his purported reaction also suggests that [his] reaction had little to do with Fisk's strike." *Id.* at 519 (citing *Miller–El II*, 545 U.S. at 246, 125 S. Ct. 2328). Concluding that the record did not support any of Fisk's other reasons for striking this venire member, Fisk's racially neutral reasons were held to be unacceptable. *Id.* at 521.

In this case, Union Pacific stated that Juror No. 3 seemed more attentive to opposing counsel than to him, based on Juror No. 3's "pleasant smile" while Haynes's attorney spoke as compared with a "closed expression" when Union Pacific's attorney spoke. The difference between a pleasant smile and a more closed expression is not necessarily indicative of anything. The nonverbal conduct relied upon in this case did not indicate assent, such as by nodding the head, or disagreement as by rolling one's eyes.

More importantly, counsel for Union Pacific did not question Juror No. 3 about his nonverbal conduct—or about anything at all—which suggests that the reliance upon nonverbal conduct is a pretextual explanation for the strike. *See Davis*, 268 S.W.3d at 519. Because Haynes's counsel also did not question Juror

15

No. 3, the assertion that Juror No. 3 "seemed to adopt a lot of the things [Haynes's lawyer] was saying" is not supported by the record.

In addition, the record does not show that the trial court credited the nonverbal conduct explanation in rejecting the *Batson* challenge. Although Union Pacific's lawyer described Juror No. 3's "pleasant smile," the trial court made no express findings to confirm this account, and the record contains no other indication of Juror No. 3's demeanor. Instead, the factor specifically noted by the trial court was that education was a primary factor in the four peremptory strikes that Haynes challenged. Nonverbal conduct was rejected as a racially neutral explanation for a peremptory strike in *Snyder* because the trial court did not specifically credit it, and we do the same here. *See Snyder*, 552 U.S. at 479, 128 S. Ct. at 1209.

## Conclusion

In an appeal from a *Batson* challenge, the question presented to the appellate court is "whether the record explains, on neutral grounds, a statistically significant exclusion of black jurors." *Davis*, 268 S.W.3d at 525. We acknowledge that a careful comparative juror analysis is much more easily accomplished on appeal, with the benefit of a transcript. *See id.* And just as in *Davis*, we have no reason to doubt that the attorney responsible for the challenged peremptory strikes in this case is anything less than "pure of heart," and we assume that he is. Our review is

16

focused on the quality of the record, and based upon *Davis* and the other well-established legal precedents relied upon in this opinion, we conclude that the record does not demonstrate a legally sufficient racially neutral explanation for the exclusion of Juror No. 3. Accordingly, we hold that the trial court erred by denying the *Batson* challenge as to Juror No. 3. We sustain Haynes's first issue in part, reverse the judgment of the trial court, and remand for a new trial.


Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.